UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANTHONY V. CORDOVA,

    Plaintiff,

    v.    Case No. 24-C-166

RANDALL HEPP, et al.,

    Defendants.

## DECISION AND ORDER

Plaintiff Anthony V. Cordova, who is representing himself, is proceeding on an Eighth Amendment claim that, since 2021, Defendants Randall Hepp and Scott Kinnard have been deliberately indifferent towards the loud and debilitating noise at the Waupun Correctional Institution. Dkt. Nos. 1 & 8. On February 14, 2025, Defendants filed a motion for summary judgment. Dkt. No. 19. Because no reasonable jury could conclude that Defendants were deliberately indifferent or caused Plaintiff injury, the Court will grant the motion for summary judgment and dismiss this case.

## BACKGROUND

At the relevant time, Plaintiff was an inmate at the Waupun Correctional Institution, where Hepp was Warden and Kinnard was a Captain. Dkt. No. 21, ¶¶1-4. According to Plaintiff's complaint, since at least January 2021, the noise level in the Northwest Cell Hall (NWCH) has been "extremely loud day and night." Dkt. No. 1, ¶¶18-22. Plaintiff states that it sounds like "people on the floor of wall street when they're trading . . . except there is yelling, loud music, and kicking on the doors." Dkt. No. 27, ¶13. He states that it is louder than the "metal stamping" area of the prison, where inmates receive earplugs due to noise from the machines. *Id.* Plaintiff alleges

he has suffered hearing loss and has been prescribed hearing aids because his ears have been "severely damaged" as a result of the noise level at the institution. Dkt. No. 1, ¶¶18-20.

According to Defendants, the NWCH is an area of the prison that is laid out like a large gymnasium or field house with four separate mezzanine style floors connected by stairs. Dkt. No. 21, ¶14. The cell doors are not solid, so inmates are able to speak through their cell door to the cells above, below, adjacent, and across the hall from their own cell. *Id.* At the relevant time, there were about 200 inmates in the NWCH and, due to severe staffing shortages, only three staff members on the unit. *Id.*, ¶¶14-15. Two correctional officers did all the work in the hall, *i.e.*, passing out meals, passing out medication, escorting inmates, enforcing rules, and issuing conduct reports for rule violations, and an additional sergeant would generally be positioned in the sergeant's cage to oversee the entire area. *Id.*

In order to maintain a reasonable noise level, the institution had rules laid out in the Inmate Handbook. Dkt. No. 25-12. Specifically, the rules provided,

> You must not whistle, sing, or participate in any noisy or disturbing activities at any time during the day. Talking at a normal conversational level to the inmate housed on either side of you is permitted from 5:40 a.m. to the 9:00 p.m. count daily, except during counts. You must not talk to inmates housed on other ranges or shout at any time, including mass movement time. Prayers or chants must not be heard outside of the cell. Talking which can be heard outside of your cell is not allowed after the 9:00 p.m. count.

*Id*. at 2. Staff in the NWCH did their best to enforce the noise rules and would write conduct reports when they caught inmates being too loud. Dkt. No. 21, ¶26. But catching violators was difficult given the layout of the unit. *Id*., ¶17. Because of the NWCH's mezzanine-style layout, noise could come from all directions, and it often took traveling multiple flights of stairs to get to the area with the noise. *Id*., ¶18. By the time a correctional officer got to the noisy area, the violator would quiet down, which made it impossible for staff to determine who had caused the noise. *Id*., ¶24.

According to Plaintiff, he wrote to Warden Hepp about the noise level issue on at least two occasions—January 31, 2021 and August 4, 2023—but no action was taken. Dkt. No. 1, ¶¶16, 26. Warden Hepp explains that, as warden, he is responsible for the overall operation and administration of Waupun; and it is not his job to walk the cell halls, monitor the noise level, or issue conduct reports. Dkt. No. 21, ¶¶3, 70. If any concerns regarding the noise level were brought to his attention, he would delegate that issue to the Deputy Warden, the Security Director, the Security Supervisor, or his secretary for resolution. *Id.*, ¶68. Warden Hepp directed both of Plaintiff's letters to others to address. *Id.*, ¶¶58, 60. Waupun Security Director Joe Falke responded to Plaintiff's January 31, 2021 letter; and Pamela Johnson, the Warden's secretary, responded to Plaintiff's August 4, 2023 letter. *Id*. Warden Hepp notes that he issued two memorandums—one in March 2023 and another in April 2023—to the entire inmate population at Waupun. *Id.*, ¶¶65-66. He addressed five expectations at the institution, one of them being the volume in the cell hall. *Id.* Warden Hepp reminded the population to be considerate to those who live in the cell hall, keep the volume down so that it does not interfere with others, and stop making noise at times when it is expected that others may be attempting to sleep. *Id*.

Plaintiff states that, on June 8, 2023, he wrote to Captain Kinnard complaining that the third-shift officers were not enforcing the "no talking after 9 p.m. count" policy. Dkt. No. 1, ¶21. Captain Kinnard responded, "I feel for you, but you have to understand they can only do so much. I will talk to them." *Id*. Captain Kinnard states that he did his best to enforce noise rules and wrote conduct reports when it was appropriate. Dkt. No. 21, ¶¶28, 47. However, it was difficult to enforce noise rules because inmates would warn each other and yell things like, "Kinnard on deck," whenever he entered the NWCH. *Id.*, ¶19. Like Warden Hepp, Captain Kinnard was responsible for the entire institution during his shift, and it was not his job to walk the cell halls, monitor the noise level, or issue conduct reports. *Id.*, ¶¶20-21. Given that Captain Kinnard was responsible

for the entire institution during his shift, he was only able to be in each cell hall for approximately 20 minutes per shift. *Id.*, ¶20. It would not have been feasible for him to have spent all of his time in the NWCH patrolling for noise complaints given his many other responsibilities. *Id.* Between January 1, 2021 and June 30, 2023 (the time period Plaintiff complaints of), there were only a total of seven inmate grievances filed by the entire inmate population about noise at Waupun, and only two of those were from the NWCH. *Id.*, ¶62.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

To prevail on an Eighth Amendment conditions of confinement claim, Plaintiff must put forth evidence from which a reasonable jury could conclude that (1) he suffered a deprivation that

4

denied him "the minimal civilized measure of life's necessities" and (2) Defendants were deliberately indifferent towards it. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). "Extreme deprivations are required" to trigger the Eighth Amendment, *see Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001), and "routine discomfort[s]" do not suffice, *see Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Excessive, continuous, and debilitating noise can deny an individual of the minimal civilized measure of life's necessities. *See Sanders v. Sheahan*, 198 F.3d 626, 628 (7th Cir. 1999); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996). But Plaintiff must establish that the noise level exceeds the "contemporary bounds of decency of a mature, civilized society" and is "unquestioned and serious." *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994); *see also Rhodes*, 452 U.S. at 347. Plaintiff must provide specific facts from which a reasonable jury could find that the risk of injury due to the noise level was "so grave that it violated contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993); *Hoeft v. Kasten*, 393 F. App'x 394, 396 (7th Cir. 2010).

Plaintiff must also establish that "the official must have actually known of and consciously disregarded a substantial risk of harm." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022). Conscious disregard means that the defendants knew that the plaintiff faced a substantial risk of serious harm and yet disregarded that risk by failing to take reasonable measures to address it. *Stapleton v. Carr*, 438 F. Supp. 3d 925, 937 (W.D. Wis. 2020) (citing *Lunsford*, 17 F.3d at 1579). That said, "[b]ureaucracies divide tasks" and "no prisoner is entitled to insist that one employee do another's job." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). The division of labor in an institution is important because "people who stay within their roles can get more work done, more effectively . . . ." *Id*.

For purposes of this motion, the Court will assume that the noise level in the NWCH constituted an objectively serious risk of harm and that both Defendants knew about it. But no

reasonable jury could conclude that either defendant was deliberately indifferent towards the issue. As a preliminary matter, Warden Hepp and Captain Kinnard were both high-level prison officials responsible for the *overall* administration of the entire prison. Neither were personally responsible for walking the halls of a specific unit, monitoring the noise level in that unit, or issuing conduct reports for noise violations. These were tasks properly delegated to staff, and Warden Hepp and Captain Kinnard are not responsible for the actions or failings of their staff. *See Burks*, 555 F.3d at 594 ("Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of those they supervise."); *see also Gevas v. Mitchell*, 492 F. App'x 654, 660 (7th Cir. 2012) (noting that "[p]rison directors and wardens are entitled to relegate to the prison's . . . staff" matters that do not require their expertise as a prison administrator (internal quotation marks and citation omitted)).

As for managing the noise level at the institution generally, Warden Hepp and Captain Kinnard ensured that the Inmate Handbook contained rules that allowed staff to monitor and enforce the noise level at the institution. Warden Hepp additionally sent out two memos during the relevant time reminding the inmate population to be considerate of others and to keep the volume down so that it does not interfere with others' sleep. And Captain Kinnard personally spoke to staff following Plaintiff's June 8, 2023 complaint regarding the "no talking after 9 p.m. count" rule. Given that there were only two inmate complaints about the noise level in the NWCH between January 1, 2021 and June 30, 2023 (and seven total from the entire institution during that same time period), no further action was reasonably required by Warden Hepp or Captain Kinnard to monitor the overall noise level at the institution. In other words, had there been a staggering number of noise complaints from different inmates during the relevant time period, Warden Hepp and/or Captain Kinnard may have had a responsibility to amend the rules and policies in place to better enforce the overall noise level. But that was not the case.

6

Case 1:24-cv-00166-WCG    Filed 06/30/25    Page 6 of 8    Document 35

In response, Plaintiff argues that Defendants "should just admit that [they] failed to execute [their] duties." Dkt. No. 27 at 9. But a violation of job duties is at most negligence, not deliberate indifference. *See, e.g.*, *Houston v. Aumiller*, No. 3:22-CV-142-MAB, 2025 WL 894961, at *6 (S.D. Ill. Mar. 24, 2025). Plaintiff also states that each inmate cell "has two vents on the back wall" from which staff should have been able to determine who was making the loud noise. Dkt. No. 27 at 12. However, neither Warden Hepp nor Captain Kinnard was personally responsible for walking the halls, monitoring the noise level, or issuing conduct reports. Plaintiff claims that Defendants have a variety of "excuses" to explain away the noise level, *i.e.*, the staffing shortage, the layout of the institution, and inmates warning each other about staff on deck. But the realities of prison life are not "excuses," and more significantly, they are relevant factors in determining what was reasonable under the circumstances. Plaintiff also notes that Warden Hepp "was charged (officially) with office misconduct and prisoner abuse then subsequently fired" and Captain Kinnard "was also stripped of his rank down to a sergeant and transferred to the Oshkosh Correctional Institution." *Id.* at 23. Those facts, however, are not relevant to this case, which concerns the noise level of the institution. In sum, Plaintiff has not provided evidence from which a reasonable jury could conclude that Defendants were deliberately indifferent.

Finally, the Court notes that Plaintiff has no credible evidence to establish that Defendants caused Plaintiff any injury. At bottom, a §1983 claim is a "tort damage action." *See Lossman v. Pekarske*, 707 F.2d 288, 290 (7th Cir. 1983). This means Plaintiff must put forth evidence from which a reasonable jury could conclude that Defendants' conduct *caused* his injury. *Id*. (noting that "[t]he principles of tort causation apply to constitutional as to other tort suits"). Here, Plaintiff has nothing more than his own speculation that his hearing problems and prescription for hearing aids were caused by the noise level at the institution. But any number of other factors—including age, genetics, physical injury, or a different medical condition—could have caused his hearing loss

and need for hearing aids. The mere fact that Plaintiff may have developed a hearing problem while incarcerated is not enough to establish the element of causation. Therefore, the Court will grant Defendants' motion and will dismiss this case.

## CONCLUSION

For these reasons, Defendants' motion for summary judgment (Dkt. No. 19) is **GRANTED**. This case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 30th day of June, 2025.

William C. Griesbach
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.